Good afternoon. The United States Court of Appeals for the Ninth Circuit is now in session. Good afternoon. This is the time for hearing the appeal in Ross v. Davis. And I understand, counsel, you have split your time and asked for time in rebuttal. So the clock will show 10 minutes for each of you. Is Mr. James or is Mr. Newton going first? I am, Your Honor. Norman James. All right, counsel, you may proceed. Good afternoon, Your Honors. As the court knows, the central issue in this case is ineffective assistance of counsel. Counsel, we're going to have to stop for a minute because I can't hear you at all. Excuse me one second. There's a noise going on in the back, too. It sounds like there might be a disruption. It doesn't happen in the courtroom. No. I'm in my conference room with the windows open and there's a truck. So we're going to be closing the windows. So if you'll just bear with us for a minute. All right, counsel, you may proceed now. All right. As the court knows, the central issue here is ineffective assistance of counsel.    So if you'll bear with us for a minute. Counsel, Bentley faced prejudice on claim one. Claim two, which Mr. Newton is going to address at the end of the claim. We are attending a bit of an unusual situation that the California Supreme Court's decision in this case was clearly contrary to the established law in the test they use to determine prejudice. Referring to the performance standard. You're not questioning anything at this phase, other than, well, we're really talking about the penalty phase and what you're talking about. We are, Your Honor, although I admit there was a disagreement, I think, between the Attorney General and us in terms of whether or not this court would decide the performance prong de novo if you decided that the contrary to the clause applied as to the prejudice prong. I think that Judge Wilson said that you wouldn't need to do that. The Attorney General thinks you would. And I think we said that you wouldn't have to, but probably looking at it now, that it would be a requirement of a de novo determination by this court on performance if, in fact, you determine that the prejudice also has to be de novo. Does that answer your question? So at the penalty phase, I mean, basically, I don't know if his name is Mr. Lenoir. I don't know how to say it. But anyway, he didn't interview any witnesses or anything like that. But there was, like, three sort of stipulated pieces of evidence that came in and that he said that your client was, like, 21 years old. And then there were some things that came in that had to do with one of the other defendants that was tried separately. And that was kind of surprising to me. I would never have agreed to that coming in as a prosecutor. And I think as a judge, I would have never let that in. I mean, essentially, it seemed that the defense was trying to say, well, this other defendant got LWOP or, you know, didn't get the death penalty. And then also that the finding in terms of trying to argue that your client was not the shooter, as it were, and so therefore arguing for lesser. I mean, if those had worked, that would be pretty good. That could have worked out pretty well for your client. And I'm – did the prosecutor just agree to that? Or did you – I mean, I never would have sat down for that. And I wouldn't have let it in for a judge. I think there's – you don't – you know, generally, what happens to other people. Well, I think that was – that was a comparative – a sentence, issue, or argument that isn't allowable. And I think the California Supreme Court, if I remember, addressed that in the fact that it has been objected to. It would certainly have not been allowed. But it's a good argument. It's a good argument when you've got a young guy, and then someone else didn't hear him. They're trying to get death on him, and then one of the codees didn't get it. Well – Well – So, Kemp, was there any actual evidence admitted that was mitigating evidence? Or is this more like a case like Andrews v. Davis? This is like Andrews v. Davis. I don't think there's any question. The Supreme Court of California itself said that there was no evidence presented at the federally phase. In fact, no evidence presented by Lenoir at the guilt phase. None. There were three things. One is a stipulation to Ross's age at 21. And number two, a stipulation that the court could take judicial notice of Mallett's sentence, the shooter, as it were. And I think the other one was a stipulation to the fact that – that's his name that's staging right now – another person that was assaulted by Ross when he was a juvenile had been – and Ross had been convicted of that. And I think it was a stipulation concerning the fact that he had been a member of a gang, or whatever that's word. I mean, obviously, from the evidence even in the guilt phase, these were all gang sort of members. But that was all. There was not one shred of evidence of any kind. No witnesses, no stipulations, no nothing concerning what we're talking about here mostly. That is, the defendant's social background. His actual family or education or social background. There was no evidence of any kind presented. And that is like any of those we gave. It's like some other cases. I've listed some in the brief that were decided to hold. The facts of the case are always considered part of the evidence on the aggravation. But that's not the mitigation, right? No, that's right. And it certainly doesn't – I think the main thing, Your Honor, is what we're talking about in mitigation here is the social background, the family history. And none of that was – But don't you mean specifically the child abuse that he suffered? Yes. And isn't that a long, well-established basis of mitigating evidence that the U.S. Supreme Court recognizes? It has absolutely, Your Honor. And Wiggins, for one thing. I think it's important to note here that the Supreme Court of California itself acknowledged that the mitigating evidence of Ross's family history was very important and was material. And, of course, they just ruled that it would, for other reasons, it was not prejudicial. But I thought it was interesting that in the later case that I cited in the brief, in Ray Lucas, which was a California Supreme Court case, in that case they actually discussed our case here in that case some years later and state with respect to this that the mitigation in Ross, this mitigating evidence was weighty, particularly the evidence of the rejection and extraordinary abuse Petitioner suffered at the hands of his family when he was a young child. Such evidence may be the basis for a jury's determination that a defendant's relative moral culpability is less than would be suggested solely by reliance upon the crime of which he stands convicted and other aggravating evidence. That was the Supreme Court's own interpretation of this case some time later in Lucas, in which they did find prejudice. Well, let me ask you this. I mean, are you arguing the proponent that if you don't, attorneys present mitigating evidence, is that affordably prejudicial or is there a second analysis of the prejudice? Well, I think. I mean, it's sort of like is it per se or is. No, no, I don't think so, Your Honor. I don't think the cases hold that it's per se automatic. There may, for one thing, keep in mind that when there is, there has to be some cases, Your Honor, where a defense attorney actually does have a reason, judgment as to why not to put on mitigation. A lot of it depends on what that mitigation may be, but the failure to do it when it hasn't been investigated, when the defense attorney doesn't know what it is, is, I think, pretty much automatic deficient counsel. Well, okay, but I'm more. But you still have to do the prejudice. Let's say I agree with you. Okay. He was wrong. Let's say that. But that doesn't equal prejudice. The prejudice prong is separate. Right. Are you saying categorically, if you didn't do it, therefore that satisfies the second prong and it's reversed. That's not the way I read the law. No, I don't read it that way either. But if you're talking about whether you're deciding it's a no vote, it wouldn't be automatic. But, of course, the court would take consideration to the actual test. That should be employed here. One of the counsel to be specific on prejudice, one of the factors the Supreme Court relied upon in deciding that it was not prejudicial was the available impeachment and rebuttal evidence. Now, can you go through that evidence and tell me why you don't think that was a solid basis for the Supreme Court's decision? Well, I can shortcut that by saying that I agree totally with Judge Kennard in the Supreme Court's dissent. And she discussed it at length. And as she pointed out, they talked about impeachment, which was the statement of the mother at a time that controverted what she said later about how he had behaved. And another was the statement that he had made to a probation officer when he was 15 and he wanted to go home, in which he denied there had been any abuse. That was the impeachment, which I agree with Justice Kennard that it was not very weak. The other thing would be the juvenile findings, which were for when he was a juvenile for, I think, robbery petitions and the most serious one being when he threatened to cook with a knife.  The cooking fork. And again, that, that, that is not an overwhelmingly rich impeachment or the jury would take that into consideration. But what the Supreme Court said is that it would have, I guess the question is whether the Supreme Court was reasonable and assuming that that evidence would compel a finding of no prejudice by the jury. May I address quickly, Your Honor, that, and that is what I call the all or nothing thing. And that is the Supreme Court in this case discussed it as if there was no choice. The council either put in all of those 15 people to talk about not only his bad abuses as a child, but also the good things about how I was a good, a good guy. So, and that's not the case. A competent attorney would be able to know, and the Supreme Court of California acknowledged that, that all of that evidence would not be allowed to reply. It depends on what mitigating evidence the council had put in. Right. I would pick out several of the witnesses of those 15. He wouldn't put on to testify. He was a good brother. He was a good son. This and that, but just the evidence of child abuse would not allow much of that impeachment or much of the evidence that they're planning would be rebuttal. So that would be a choice of competent attorney would pay. So. We have to make a determination though, that the California Supreme court's conclusion was unreasonable. Um, and I'm trying to figure out, especially in light of what the Woodford versus the Scotty case, um, how you would say that we would accomplish that. Well, you wouldn't have to make that a conclusion. You agree with what we're arguing. Let's say for purposes of this question, that we don't agree with you on the contrary, that we're looking at this based on the unreasonable application. And we're under at public view, I guess. I want to know what's your best case, especially in light of Woodford versus the Scott. Oh, uh, the, what's the reason. Most recent case of the circuit. I thought I had it here, um, is, um, a discussion. I think that was the one that was just, I mentioned earlier. Sorry. Yes. Um, the Scotty case, I don't really think is applicable. Um, because why tell me why? Well, there were two, it was a complex thing. There were, there were two separate claims of ineffective assistance in the family phase. One was the closing argument, which he proceeded most of the aggravating factors that are in the code. That was the argument that was separate from the failure to investigate and present mitigation. And those were the Supreme court's decision on that avoided and didn't even discuss the argument of one. And instead, uh, determined that the, uh, prejudice, uh, it was prejudicial or the mitigation, uh, and, uh, outweighed the, or did not weigh the aggravation. But I thought the Scotty was confusing because the circuit decision on that complex to, uh, it talks about the closing argument and the mitigation and those two were separate. Uh, claims. Just for what may ask one other question. Uh, this Mr. James, uh, I wanted to ask you what, what investigation was done on, on Mr. Ross on his mental health throughout the case. Uh, there's some reference in the district court's 2005 order, denying your motion for an evidentiary hearing to Dr. Myers referring to Mr. Ross as an apparently retarded individual. Uh, but beyond that, it doesn't seem to me that we have much on, on Mr. Ross's mental health, uh, what, whatever happened with that or what. Well, there, there wasn't an adequate effort made, uh, to, to obtain an expert, uh, to put on at the reference areas what happened and the judge, Judge Stein and disallowed it, uh, that it was not appropriate because they had not been brought up, I think, at the, at the trial stage. And we brought a motion, uh, to permit that, uh, before judge Wilson, he denied it. To permit what? To have our own expert, uh, the expert that, that the previous attorneys in this case found an expert who would have found, uh, what you're discussing in terms of mental health. Uh, and wanted to put that expert on, but judge at time, it would not allow it. So it was beyond the scope of the reference hearing and judge Wilson agreed. And so we were unable to do that. I doubt after penholster would have been invisible. It's where one may, I asked a question about heading into Mr. Is it, uh, Newton is time. Yes, we are. Yes. We'll have a 10 minutes. I mean, I I'm go ahead, please. Thank you. Mr. James, this is a factual question. It was in the record. Didn't tell us anywhere. The 14 year old disabled child that was executed. And, uh, do we know what his disability was? I think it was a learning disability. It wasn't a learning disability, as I understand it, remember it. So that he, uh, it wasn't, I don't think it looked like he was physically disabled. He had a learning disability and so he went to school, but only halftime and his dad came and picked him up. So if the, I guess if the argument was that what supposedly that did he, that he killed him to eliminate a witness, I guess by the time we get to the last robbery, though, the, uh, your client, um, raped the sister twice. And then kills the, the, uh, the alleged drug dealer and victim, um, execute that person in front of the mother. So it doesn't seem that they decided they needed to get rid of all the witnesses at that point. Well, there was no evidence that, uh, Ross, who was convicted on a felony murder, uh, uh, basis. There was no evidence that he was the shooter in either of those cases. None. And in fact, that's, uh, that's acknowledged in the Supreme court of California's case. He wasn't charged with being the shooter, was he? Well, I don't, there was a, an assertion that a statement he made, uh, to, I think in the Taylor case that, um, I'm the one that calls the shots when he was in charge of both of these, but in the Hassan case, there's only fingerprint evidence that he was even there. Uh, but there is no evidence that he was the shooter. And may I, the reason I think it's an interesting point in the Hassan case, there was a tape recording of a conversation that he, Ross had with champion, which was put in by the government as, uh, for establishing, uh, that he participated. But in the conversation was the fact that Ross asked champion, the question, was that a waterbed in the room? And he asked champion and champion said, uh-huh. And that suggests at least you can infer from that that Ross wasn't the one who was in that bedroom and shot, uh, Michael and Eric on that bed. He was asking about it. Uh, it's a, a minor point, but it is, it does suggest that, but in any event with respect to whether he even killed Michael Taylor, there's no evidence of that. And your honor, just telling, I may ask, say that in that case, do not forget that, that mallet came into that with the gun. He's the only one that was ever seen with a gun there in a Taylor case. And he's also the one that told Mary, uh, either you do what we say and get the drugs and this and that, or I will kill all of you. Uh, starting with you, that was mallet, not, um, not Ross. So none of it is. Your client raped her twice. Yes. No question about that. He left his fingerprint on the bathtub. But in terms of, if we're talking about heinous offenses, in terms of that offsetting mitigation, there are a whole lot more heinous offenses than this of which I know the court's aware, uh, uh, in terms of balancing the aggravating, uh, or mitigating evidence against the nature of the crime. All right. Why don't we let Mr. Newton have his 10 minutes now? Uh, your mic, you're, you're not muted. Yes, we can hear you now. Okay. If I could, uh, segue back to the last question in terms of the, uh, the murder of Michael Taylor, uh, the three people entered the Taylor apartment, our client Ross, uh, individual by the name of Jerome, Evan Meyer, uh, mallet and the, uh, the third person who's only identified as a tall guy, the, uh, the, the Taylor family, uh, stated that, and if you can find this in, um, in volume 10 of the reporter's transcript pages two, one, four, six to four, seven. Uh, it was Malik who said, if you don't get me the drugs for the money, I will kill each of you. Ross went into the bathroom and raped a Mary Taylor. And then, uh, Malik came into the bathroom and, uh, Ross said, we have to get out of here. Ross and Malik left the bathroom, leaving in the bathroom, uh, Mary Taylor, her mother, Cora, and a friend. Then there's a shot hurt. Now no one knows who shot, uh, uh, uh, Michael Taylor. There's no evidence who the shooter was, although there's strong evidence or at least certainly in the inference, given the fact that it was Malik and only Malik who had a weapon. But I think also importantly, before Ross went to trial, uh, the district attorney's office in Los Angeles charged Malik as a principal in the murder of, um, Michael Taylor. He was tried in Long Beach and he was convicted of being a principal in the murder of Michael Taylor. And in doing so using a firearm, Ross was charged along with his co-defendant, Steve champion with respects to the Michael Taylor murder as being an ater and a better, he was not charged as the shooter in the Ross trial. And Malik sentence sentence was 46 years to life because while he was found guilty as a principal for killing Michael Taylor and found, uh, that that was enhanced by having possession of a gun, the jury hung according to, um, uh, the, the prosecutor in, in, in, in Ross's case, uh, the jury hung because, uh, uh, they couldn't agree on the special allegation of robbery or burglary. And that's, um, uh, that can be found in volume 15 of the reporter's transcript at page 3516. So they hung on the special circumstance. They hung on a special circumstance, which took away the death penalty. So he was sentenced to 46 to life. Okay. But on your point, as to your Edmond versus Florida claim, didn't the jury necessarily find that Ross possess the requisite intent to kill when it convicted him of a special circumstance, given that the jury instruction, but again, her instruction is for that part. Respectfully. No, I know that's what the California Supreme court said, but if you look at the actual jury instruction, it's 8.8 0 Keljic 8.8 0 that instruction, according to the California's 40 Supreme court, uh, by finding that allegation to be true, the court said it necessarily, um, shared that it proved that it was that, that Ross necessarily shared the intent of the shooter or the killer. And the problem with that is if you look at the jury instruction itself, it says if the defendant is not the actual killer, it must be proved beyond a reasonable doubt, the, the aided the actual killer in the commission of the murder. But that could be the same thing that happened to poor Mr. Edmond, who was driving the car. Two guys get out of the backseat of the car, go around to the back of the house and shoot an elderly couple. He aided the commission of the murder. But Edmond is all about one thing. Death is different. You have to have the specific intent to kill, attempt to kill or intend or actually intend to kill. And Tyson said that the intent to kill element would be met by major participation and reckless disregard for life. But was Edmond decided at the time that the California Supreme court reasoned that way on the direct appeal? Edmond was decided in, um, in July of 1982, the Supreme court decision in this case came down in 1995. So, so they had the, they, they don't cite to Edmond. They don't cite to Edmond. They don't cite to the fact that this is that Edmond applies in eighth is different. They don't cite to the specific intent of Ross or of, of Ross with respect to either the Hassan or the, um, the Taylor murders. Uh, and quite frankly, under the cabana case that I cited in our supplemental brief, the Supreme court says that if in fact there's not a specific finding that the defendant had the intent to kill, attempted to kill or intended to kill that this case has to go back to the state court for that finding to be made. Well, the special circumstances are, uh, instructions that if defendant was not the actual court, let's be proved beyond a reasonable doubt that he intentionally aided, abetted counseled, commanded, sued, solicited, requested, or assisted the actions of the commission of the murder in the first degree, that first degree murder to be true. Is that correct? That is correct. And what's missing from that instruction is any reference to the aiders and debtors intent under felony murder. It simply says if he aided or assisted the commission of a murder, respectfully, I would suggest that if, uh, I drove like Mr. Edmund did, if I drove somebody to a house knowing that they were, they intended to rob him and in the process they killed him, I would have aided the commission of the murder. But what I'm missing is the intent that Ed, that Edmund says you have to have, if you're going to execute somebody under a felony under a felony murder rule, who is not the actual killer. Mr. It looks like the juror to the jury instruction, um, considering the special says, you know, and I'm trying to figure out why, why isn't enough that the jury made the special circumstance finding that Ross and his quote, intentionally aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of the murder. And the first degree, what, why isn't that enough under the Edmund Tyson rule, especially in light of our Papua. Because it has, it simply says if the aider and a better performs any act that assists the killer in the commission, the first degree murder, then, then he's guilty of first degree murder. Whereas Edmund says, no, no, you've got to also show the intent of the aider and a better in a felony murder case. What should the instruction have said in your, it would have had to say if he, if he aided and abetted with the intent to kill, attempted to kill or intended a murder to take place. That's what Edmund says. That's the intent that should have been put into that instruction. Instruction. Does it talk to you? The jury separate determination that Tapia was guilty of special circumstances related to both murders. When it, when it shows that necessarily determined that Tapia had or shared a specific intent to kill both of the victims. Wasn't that evidence present here? I respectfully know. And I would also point out again, death is different. Edmund and Tyson are, are, are cases where the question is what it has to be the intent of an aider and a better before we can convict him of first degree murder. It, it has to be more than just being, he assisted in some way for the other person to kill the person. Tapia also was not a death case. And our, our position here is based upon the fact that since the death penalty was sought and imposed, you have to conform to Edmund. Right. But what the Supreme court of California said, that is in finding the special circumstance allegation to be true, the jury necessarily determined that the defendant shared the killer's intent when he aided and abetted the commission of the murder. So why is that sentence incorrect? Because it doesn't discuss what intent you're talking about. Is it an intent to assist the perpetrator of the crime in some form or fashion, or is an intent to, to assist the perpetrator and, and share the same intent that there be a, a, a homicide take place. You know, it, if you read that instruction, it is completely silent on the question of the aider and a better intent. And, and, and, you know, by definition, in most felony murder cases the aider and the better is not the one who pulls the trigger and the Supreme court recognized that in the Edmund case and said, we can't allow somebody to be executed simply because they aided and abetted somebody else, committed a crime unless that same aider and better has the same intent. But even under Tyson, I mean, because in Tyson, we said a major or the Supreme court has said, you know, major participation in the felony committed combined with reckless indifference to human life is sufficient to satisfy the Edmund culpability requirement for when the death penalty may be imposed. So what's your response to that? The Edmund decision said you in looking at the aider and the better, and to elevate that person to the, to the person who actually pulls the trigger, you have to have three things evidence beyond a reasonable doubt of three things. One, the aider and abetter was the killer. Two, the aider and the better attempted to kill or three, the aider and abetter intended that a murder take place. Now Tyson is simply defining what that third element is. But in this case, the jury was not instructed to any of that. It was simply told that if Ross intentionally aided this other person commit first degree murder, this California Supreme court says, if you find that true, then you have found Ross to be guilty under, under the felony murder rule. But Edmund said, no, you can't find him guilty under the Edmund rule, unless you find in addition to the fact that he's intending to assist, the best example really is, is Edmund. The driver, Edmund drove the car to the house where two other people got out of the car, went to the back door and killed him. He didn't have any way of knowing that was going to take place, but certainly he assisted. You've muted yourself again. It pushed a mute button. Okay. Better. Yes. Okay. I, I, I, I would just emphasize that again, this, uh, this instruction, which is Calgary 8.8 zero simply says if Ross assisted the killer in carrying out the act, then according to the California Supreme court, Ross necessarily had the same intent, but Edmund says, no, you prove it, find that intent, which is why we're saying that since it's not in the record, there's no finding anywhere, but this case has to go back under Kavanaugh to the state court for them to determine whether that finding had ever been made. Let me ask you one quick question. This book, which is admittedly outside the record. I'm sorry. I couldn't tell. It's admittedly outside the record. I don't think it had to do. I'm unaware of it. And I should be aware of it if it had anything to do with this appeal. I know he's, he's, he's been a prolific writer. He's written a book. I didn't read it. I, I wanted to, I don't really know what Mr. Champion did. He was a co-defendant in the trial, obviously, but I really, I've had no together. I wrote it together. I am not familiar with the question. I won't read it for now. I have a, I I'm still, I have a couple more questions related to admin. So as I understand what the California Supreme court did was it said, these are erroneous instructions on specific intent, the two, 3.01 and Oh three, they were erroneous. They cited a case that their own case that said this is erroneous, but we're going to find that the jury made this finding anyway, because of this special circumstance instruction. Is that the instruction you're referring to when you talk about aiding and abetting liability? Right. Or is that a different line that they're relying on? No, that's the instruction. It's, it's a instruction number 8.80. It's the special circumstance instruction. That's what was given to the jury. And, and as, as I've said, all that instruction says is if the defendant is not the actual teller, if he aided the killer, then you find a special, but he had to have this and their admin has had to have a specific intent to kill. We're not aided, but we had to share the same specific intent and the conference Supreme court says that too. It's this thing. They make a lip elite, but anyway, that being said, suppose we agree with you on that claim. We agree with you practically. Does Ross have to be completely retried? No. What Kibana says is if there was no evidence of the intent or, or if, if, if, in Kibana's findings, right. Kibana says that if, if there has not been a finding of, of the, the aider and a better being the killer or having attempted to kill or intended to kill as in part defined by the Tyson case, it has to go back to the state court because as a matter of comedy, the federal courts should not make that determination. It goes back to the state court and they can make a determination. If the record, if the record at trial and in the court of appeals contains that finding, then they can, then they can bring it back to the federal court and basically the case is over. But, but the, the court made a very specific point in that it should not be a certain court of appeal making that decision. It should come from the state court. So what we have suggested is since that jury instruction 8.8 zero does not have anything to do with what was in the mind of Ross, did he, did he kill and intend to kill, attempt to kill sensors that, that jury instruction is silent. It simply said, if he aids somebody else, that question has to go back to the, to the state court. If the state court then enters a finding saying, yes, the evidence in the state court proceedings evidenced an intent to kill Allah. What's what are the requirements of Edmond? Then that would be the end of this. We'll come back to this court and you could have fun. All right. Thank you, counsel. Why don't we hear from the warden, Mr. Mercer. Definitely in your honors. I'm going to please the court, Stephen Mercer for the respondent. I'll take the claims in the order that they were discussed. That's okay with the court. Your honors touched on the real essence here, and that is the reasonableness of the California Supreme court adjudication and submit to you that he is not entitled to federal relief on that claim because the state court adjudication was not contrary to, nor an unreasonable application of the clearly established strictness and that reasoning and that adjudication was patently reasonable, or at least three reasons that I'd like to highlight. First, that adjudication came only after extensive fact finding through the reference hearing and evidence hearing and it lasted two months and called 32 witnesses. And then in a published analysis spanning 40 pages, the court citing and following Strickland carefully considered how the penalty phase would have proceeded. The defense attorney left no stone unturned and had presented every shred of available evidence and mitigation. The court didn't blindly accept the facts from either party. Did you say the defense attorney left no stone unturned? Did that make sense? I said that the California Supreme court over its lengthy Strickland analysis, they considered how the penalty phase would have proceeded. Had the defense attorney done everything that my friends on the other side of the aisle say that the attorney should have done. Do you know what happened to, to any mental evaluation? I just try to figure that out. Cause you're saying that, you know, we'll take at this point that they, that they didn't do everything. The Supreme court did take into account that the council could have done   but there's a reference to the Supreme court that the Supreme court reference. It's a little troubling to me. I'm not, uh, based on the Dr. Myers report, um, that says the refers to the, to the process as a mentally retarded individual. Do you know anything more about that? I do not your honor. And I'm not aware of anything in the state court record and certainly not in the California Supreme court decision that, uh, establishes that Ross had any mental disabilities. I'm not aware of any mental health. The council didn't conduct any investigation as to whether or not he had mental disability. And my understanding is that if the referee didn't allow that evidence, then because, um, it wasn't within the scope of the six questions that the California Supreme court asked the referee to make findings on. Do you agree with that much? I agree with that. All right. So I would, uh, I would say that. The state's ultimate conclusion here is that the verdict would have been the same, even in light of the mitigating evidence from the reference hearing. And I would submit that that is a reasonable decision and hardly surprising because of Ross's book is criminal history. And the fact that he committed the most serious and heinous crimes possible under California law, he participated in three cold blooded murders carried out in two separate plans, home invasion robberies. This included the murder of a disabled child who, by the way, I believe was in a wheelchair, uh, that either found in a wheelchair or the wheelchair was his and in the house. So it was a physical disability. Uh, and Ross personally raped the sister of a third murder victim twice. Given the overwhelming aggravating factors, there's no reasonable probability that. Well, let me ask you this. Um, he's frozen. Oh, I'm frozen. No, he's frozen. Oh, there he's back. Okay. Let me ask you this. You argue that Andrew C Davis is very similar to this case, but we reversed Andrew on bond after you filed your three. How should that case impact on analysis now? Well, I would submit that the case is actually, there's less mitigating evidence in Ross's case by far than there wasn't Andrews. Let's, let's recall that in Andrews, there was continuous physical and sexual abuse at what was called a slave camp for children, where Andrews, uh, had endured extreme ongoing physical and psychological abuse. Uh, I would also point out that in Andrews, there was actual evidence of brain damage of PSTD, uh, or excuse me, PTSD. And then Andrews suffered extreme trauma and abuse. There is none of that here. We have a father who was physically abusive when he got drunk and went to the track. Uh, he, and there's no, I'm not disputing or downplaying, but he was physically abused by his stepfather. He was hit with a belt several times. I would point out that so are all of his five siblings who all grew up to be productive members of society and not murdering rapists. Uh, so the abuse in, in Ross's case pales in comparison to the extreme sexual and physical abuse endured at a slave camp for children, which was the Andrews case. Um, I would also note that in assessing prejudice, it must also consider what counsel did do at trial. What are we to make of that? Does the court conflate the Strickland prongs as Ross argues? No, you're honest. Uh, they did not. Um, first off the California Supreme court at the outset of its legal discussion and then several times in the brief site Strickland, they quote the prongs. They state the test that they are doing. Uh, Strickland itself, uh, said that you must consider totality of evidence before the judge or the jury. Now that evidence comes in in different ways. Uh, you can argue a penalty case based a face case by referring to mitigating evidence of the circumstances of the crime, which is exactly what counsel did here. So you wouldn't ignore that. You do as Strickland said, and as the California Supreme court followed precisely, uh, they said the test before us, and I'm quoting from page 25, this is the California Supreme court. The question before us is whether, have the mitigating evidence been presented at the reference hearing, been presented at trial. It is reasonably probable that the outcome would have been different. That's pure Strickland. Uh, you see, you don't ignore everything that counsel did. You look at the impact of the unprofessional errors, uh, and how the penalty phase would have proceeded absent the errors. You, uh, you compared, uh, Mr. Ross to his siblings. Do we know if any of his other siblings were born at least a month prematurely due to a violent attack on their mother by their father? I'm not aware of the birth circumstances of any of the siblings. I guess I just trying to figure out because we have to determine, not, and I understand not just whether or not it was reasonably possible that at least one juror would have been moved or swayed by the evidence of the 15 family members or our describing abuse that, uh, that Mr. Ross suffered or was, uh, or was exposed to, uh, some of it, which was rather violent. I know it may not be perhaps the same, uh, abuse suffered by Mr. Andrews. Um, but here there was 15 family members who were willing to come forward and testify, uh, you know, about the, the, the, the serious abuse, which I think the state Supreme court acknowledged was significant or substantial. I think it's the word that they use. Um, and so I'm saying we have to determine whether or not the Supreme court's decision was unreasonable and saying that no, not at least one juror would have been swayed by it. And that's what I, I want your help with helping me sort that through because it seems that, um, can we say that at least not one juror or that, you know, hearing everything that all these 15 family members would have, would have very painfully and eloquently said, and I understand the aggravating nature, you have to take that into account. Um, but, uh, especially in light of Athena, can you tell me, um, how that factors in? Absolutely. Uh, as a threshold matter, I would dispute the, the test. The test is not, it will be on at least one juror standard. I know that's, that's comes from Wiggins v. Smith and that was a jurisdictional matter because under Maryland law, if one juror did not, uh, if the jury was not unanimous about the verdict, a death sentence cannot be imposed. So that was Wiggins talking about Maryland and it was repeated again in Andrews v. Texas. So what if one juror holds out on the death penalty in California? Then it's a mistrial. It's different. Uh, then there's a retrial of the penalty phase. It's not the Wiggins situation where it's one juror. I think we are quickly reversed here because he wouldn't have had the death penalty if one juror would have, would have not gone along. No, but you're saying at that point he wouldn't have, and then the state would decide whether or not to retry it or whether to just enter into an agreement for life without parole or something like that. That's correct. But I would point out that as Strickland itself says, it's not a one juror standard. It's whether the decision actually reached by the state court would reasonably likely have been different absent the errors. So it's, it's not under a pure Strickland test. I think that that one juror question is misleading. It's, it's whether the decision outcome would have been reasonably probable to be different. That's the decision in Wiggins and Williams and, uh, Avina in, in Andrews. And that's all our precedent. It sounds like you may have a different view of that, but I'm just trying to go based on our precedent with guiding us and what's And so if you can confront Avina, Avina for me, please, I'd appreciate it. You'll have to refresh my recollection about Avina. Well, it was August of 2019 that was offered by Chief Judge Thomas. And, uh, basically it was an individual who went on a crime spree. It was pretty aggravated in terms of the, uh, of the crime. A shooting spree where independently targeted people driving by attempted carjack eventually killed two people. Their counsel didn't interview family and didn't investigate background. Um, and the family would have testified that he was loving person. And one incident where, uh, Avina threw a chair at his dad to protect his mom during domestic violence. Um, there was also evidence there of his PCP that he was on PCP, uh, and suffered, uh, Hallucinations fall on, uh, PCP. Um, so the council was deficient, um, and California Supreme court, um, apparently, uh, you know, determined otherwise. And the, our court found that California Supreme court unreasonably found it was an echo review, um, based on the unreasonable application of, uh, from the California Supreme court. So you're not familiar with Avina. Well, I will, I will point out that there's none of that type of mitigating evidence of Ross's case. We've got other than the family. That's the reason I'm asking that same kind of mitigating evidence. That's an issue here with respect to the family. Okay. Yes. I misspoke about the family members. I was talking about, uh, evidence of hallucinations or drug use. Uh, there simply isn't that here. I would point out your honor that the California Supreme court itself weighed all of these things in great detail. They acknowledge the strengths and weaknesses of the evidence on both sides. They acknowledge the statements that Ross's own mother, uh, about how, you know, that he, he hates white people. Now he's I've done all I can and out of my six children, he's the worst. They, they wrestled with the strength and weaknesses of this very carefully. There were dissenting judges here. That means that fair-minded jurors could disagree about the outcome. And I do not dispute that different judges viewing this matter could have reached a different outcome or weighed the evidence differently, but clearly given the overwhelming aggravating factors versus the missing mitigating evidence, which was essentially I was well-loved by family members and had some abuse from my stepfather. The cancel the error here is the failure to investigate, not just uncover all of this readily available testimony from respectful people, respectful, um, physicians. Um, but if there was no mental health evaluation, there was no medical evaluation there, there, um, there was nothing. There's no looking at school records and finding the trauma points in his life. I mean, this lawyer, and it's the same lawyers in Andrews. I mean, he did nothing. So when you say what, you know, what did, was there that could have come up? I mean, a psychiatric evaluation that wasn't allowed in the record during the referee. I mean, that's it. That's the ineffectiveness. I want to ask you, do you agree that counsel's performance was deficient? No one is saying that this guy did a good job. Okay. Do you agree that under Strickland, this counsel's performance was deficient as a district court found for the purposes of this case in this argument? Yes. I would agree with that because the California Supreme court assumed that the very thing for the purposes of this state court adjudication. So what I think about counsel's performance or what this court thinks about counsel performance, the district court held it was deficient. Are you arguing we should reverse that? The district courts, the district court here denied habeas relief because there was no prejudice that after a finding that counsel's performance was deficient. Are you saying we should reverse that finding? No, your honor, because even if this court believes that counsel's performance was deficient, this is a 2254 case. So relief is still barred unless this court finds that the Cal Supreme prejudice prong analysis, because that's the only adjudication we have is pronged to prejudice, but still would bar relief unless that prejudice prong analysis was, as Richter explained, so lacking in justification that there was an error in existing law beyond any possibility for fair minded disagreement. So I'm just going to ask you, I mean, cause I understand what's your ultimate argument here is the one we have to deal with and wrestle with. And so how can we know what would or would not have influenced the jurors in this case? I mean, you don't any more than I do. Let me ask you this. Is it not unreasonable to believe that not one juror might be moved by the evidence of Ross's very rather turbulent background and possibly character testimony from his family? I suppose that's possible, your honor. And the California Supreme court acknowledged that very possibility. But this is how the judicial review process was supposed to work and did work here. I'm sorry to interrupt you, Mr. Mercer, because I didn't ask whether it was possible that my, my question and what we have to deal with is not a reason. And to believe that at least one juror might be, I mean that, and that, you know, the California Supreme court here, majority determined that that was, you know, I guess determined to otherwise. And I'm just trying to figure out, was that really reasonable? I don't dispute that, that that also would have been a reasonable outcome in this case. I don't dispute that. Standard standard. Let's admit it. Prejudice is squishy and people see it differently. And we have different experiences, judges that we come to this in terms of what we think something would make a difference or not. And, but under the standard, how many judges said it wouldn't have made a difference. So what the California Supreme court was what five to two. That's correct. And so then the referee said prejudice, but the California, but then, all right. And then the district court said no prejudice. So we're at six people, I guess. I think this case is a perfect example about how fair-minded jurists could and did disagree about this case. And that, that is not the standard for relief. If that is true, if fair-minded jurists can disagree about the outcome of this case, then that's a bars relief. So yes, I think fair-minded jurists could and did indeed disagree about this case. I don't dispute that, but the question is, is there a theory that supports and justifies the majority opinion here? And obviously unanimity is not the yardstick for the reasonableness of an appellate opinion. Every, everybody, all of your honors have been on majority and dissenting in opinions. It doesn't mean that the majority opinion is objectively unreasonable. They might disagree with it, but it's not objectively unreasonable. Can I ask you about the Edmunds? Yes, your honor. So last cited Edmunds versus Florida on a direct appeal to the California Supreme Court. So, but you're arguing that it's procedurally faulted. I'm not so sure I agree with you on that. Okay. Well, the California Supreme Court expressly stated that it was procedurally barred. When they denied the habeas corpus claim in 1999, they said it's procedurally barred on the ground that it was both untimely citing Robbins and quote, because it could have, could have been raised, but was not raised on appeal citing Dixon. It was raised, but not under the name Edmunds. It was raised as an argument that no specific intent was found. And, and, and because the jury wasn't asked in the aiding and abetting instruction to find a specific intent to kill on, but as to Ross, but they answered it. They didn't answer it under the rubric of Edmunds. What do we do with that? Well, my understanding is they answered it in the context of how it was raised, which was a state law claim about aiding and abetting instructions. And you know, they, there were some back and forth about, did the California Supreme court or did the jury make an actual finding about his intent? And the California California Supreme court answered that question in the affirmative at supplemental excerpts of records, page 112. The court said, quote, we have repeatedly held that a reasonable juror would construe this instruction referring to the special circumstance instructions as imposing a requirement of intent to kill. So there's no mystery about what intent the jury found it was intent to kill. So I guess my question, I agree with you. That's exactly what the California Supreme court did. But I guess my question is, is okay. So that issue of whether there was specific intent to kill, which was not called Edmund, but it's the same issue as what Edmund requires. You at least recognize that, right? Okay. So it's the same issue. So I don't see, I don't see why it's procedurally defaulted because I mean, it seems like it was redundant. It was raised again, only using the name Edmund at that point, but it was already raised in answers by the Supreme court. You know, it's, it's, while these issues involve the same thing, they involve aiding and abetting liability. It was raised on direct appeal as an aiding and abetting claim. And one of the instructional error, it was a state law claim. They resolved that issue as a state law claim. It wasn't until the Edmund claim was raised in 1999, where they, the Ross in fact alerted the court to his federal claim, Edmund and Tyson. It was at that point where the California Supreme court expressly found the claim was procedurally barred. And this court and the U S Supreme court has found that the untimeliness bar is a clear indication that, or I'm sorry, Robin's site was a clear indication that they had imposed an untimeliness bar and the Dixon bar of not raising an appeal, the U S Supreme court in Johnson V Lee said that was adequate. Procedurally defaulted. Can we find that Ross possess the requisite intent to kill when it convicted him of the special circumstance murder given by the jury instruction on that chart? Absolutely. Your honor. If this court chooses to look at the merits of the claim, the claim fails because the jury found may have finding a factual finding about his intent, but he harbored intent to kill. This court in Tapia V Roe acknowledged that such a finding by a California jury means that the omission of the aiding and abetting instructions was harmless beyond a reasonable doubt, and that it didn't have an injurious effect on the verdict. And even, even more so is the jury instruction problematic. Oh, it was problematic in that, that as, as the California Supreme court noted, there were instructions that were omitted. So there was state law instructional error, but, and, and then this instruction here, the intentionally is aided abetted counseling or requested or assisted the actual color. There's no, it doesn't come in front of the killing, you know? So it seems like it's problematic without copy. And I'm trying to figure out in a decade, whether it's problematic or not, I would submit that the California Supreme court number one is the final arbiter of questions involving state law instructions. And number two, Tapia is a decision of this court and found it upheld what my argument. No, I understand. And I'm just trying to figure out if Tapia is enough here in a death case. Tapia was not a death case. Well, even without Tapia, you have the Tyson test itself. And I think it's beyond serious debate whether Ross was a major participant in these crimes or reckless indifference. He committed these crimes in concert with fellow gang members. He was present at both murder scenes. He raped one of the murder victims sister twice. He made no effort to assist the dying victims. He failed to report the murders to the authorities. And then he, he and his cohorts from his gang did the same thing just days later at another home invasion robbery. So clearly he was a major participant and acted with reckless indifference. So no matter how this court goes, whether it's procedurally barred, whether it's harmless error because of the finding of intent or whether this court applies the Tyson test, the relief is barred under any of those scenarios. I, unless there's further questions, Your Honor, I would summarize by pointing out that no holdup from the United States Supreme Court required that the California Supreme Court had to decide either of these claims in Ross's favor. Therefore requires that that state court adjudication of the claims must stand and the judgment of the district court should be affirmed. Thank you. All right. Thank you very much. Counsel. Um, I think, uh, Mr. Mr. James, you each have five minutes. Um, Mr. James, you're on the. Sorry. All right. Um, without being a dead horse, we fully, um, bring the issue of the contrary to that. We plan. I would say this, that the question was asked simply, and I think the right one is, was it permissible for the California Supreme Court to include and to assessment of prejudice, the argument and strategy of the deficiently performing attorney, because they did assume deficiency. Well, the answer is that there is no legal support for that at all. And in fact, there's for the argument that that is not permissible, that it is contrary. I just wanted to say that the Supreme Court, if you look at their, uh, their decision, uh, the two 10 and two 11 pages, but I really get into the argument and they actually specifically hold that the argument and the strategy of the attorney Lenore must quote, must be considered and would have justified not offering the mitigation. There are, there is no support for that in the established law. The Supreme Court, as we decided, if you look at Sears, Sears specifically considered that that was the issue there was the adding the performance of the deficient counsel into the equation. They cited this, this, uh, balancing test, which is repeated throughout law. We consider the totality of the available mitigation evidence, both that initial trial and the evidence produced in the media's proceeding and reweigh it against the evidence and aggravation. And Sears they say in all circumstances, the proper prejudice standard for evaluating a claim of effective representation, uh, is that test. And if you look at, I won't get into it, it's in the brief, but if you look at their, their, uh, uh, I think it's footnote 10 in Sears, this is exactly what they discussed was considering the argument and strategy of counsel. And in that case, uh, there was no question that there actually was a strategy and an argument in this case, one cannot even argue that. Uh, so I think I would ask the court to carefully consider whether or not that's appropriate or proper. I think it's not. If you look at all the cases right down through Amherst v. Texas, 2020, assessing whether the petitioners may be showing a reviewing court must consider totality, the available mitigation evidence, or was that adjusted trial evidence adduced in the Habeas proceeding and reweigh it against the evidence and aggravation. Argument is not evidence. Uh, the strategy of the council is not evidence. And once it's concluded that the strategy of the council was deficient, then that strategy and that argument is irrelevant. As the courts have said, uh, including in Strickland, I wanted to quickly address, uh, the, the issue of, of the reasonableness, which I don't think applies, but nonetheless, uh, looking at three major cases, certainly, uh, in Andrews, uh, there was some evidence of mitigation in that case. Uh, and there was also some evidence, uh, in, uh, in, uh, this guy, there was a strategy and evidence presented. It just was not with an adequate investigation, uh, to, to make that viable in this case is just like, uh, the most recent one in 2019 arena in that there was no evidence of any kind of mitigation. That's what sets it apart. That's what sets it apart. There was no evidence here. There was nobody. Uh, and I agree. It doesn't automatically mean, uh, that, uh, it's, uh, uh, no, unreasonable to, to find it, uh, to have no prejudice, but certainly that's, as it's pointed out in the being, that's a very important thing to say that, that this, that there was a reasonable determination here when there had been no effort and no mitigation presented, um, is, uh, unreasonable even though I don't think that's, um, I think that's 25 minutes. Thank you. Right. Thank you, Mr. Newton. Thank you, your honor. Uh, the Edmund issue was, came up well before February of 1999. In the opening brief on direct appeal, Edmund is cited, um, at page 13 of the supplemental excerpt of record and also pages 12, 16, and 17. In the closing brief, Ross pointed out in his closing brief that the attorney general had not even addressed the Edmund argument. That's at page, uh, 42 of the supplemental excerpt in the opening supplemental brief on, on direct appeal. Edmund was cited at page 57 and at page, excuse me, at page 57 in the supplemental brief. And in the closing supplemental brief, uh, Edmund was again cited and Tyson at page 62 of the supplemental excerpt of record. The point being, counsel says this was a state court determination of state court law. Well, that's hard to reconcile with the fact that Edmund was decided four months before this trial started in 1982. And it was on the books and had been on the books for 15 years when maybe it's 13 years when, when the California Supreme court issued its decision. And to get back to one comment, uh, uh, raised by the court. The problem is how do you, what does it take to kill somebody who aids in the bets of felony murder? If he's assisting in the underlying felony, uh, but there's no intent shown as defined by Edmund in the, in, in his participation in the actual murder. Uh, it's not sufficient because death is treated differently. And the jury instruction 8.80, if you read it, it only says that if Ross was not the killer, but he aided the killer in the commission of a first degree murder, then that finding is supposed to somehow satisfy the rule at Edmund. It simply can't. And, uh, I think if we deal with the fact that the Supreme Calvary Supreme court on did not explicitly refer to Edmund. Well, I don't think you can give much weight to a state court, which has a decision directly on point of felony murder and ignores Edmund doesn't even address it. Doesn't even discuss it. As I just pointed out, certainly counsel for Ross raised this on appeal, on direct appeal. I mean, it's Ross's attorney was saying to the California Supreme court, your interpretation of felony murder is inconsistent with felony murder under the laws of the Supreme court. And that's the reason that decision is completely contrary to Edmund. All right. Um, does anyone have any further questions? All right. Thank you. Thank you. Counsel. Thank you. Um, Davis will be, um, submitted and the session of the court is adjourned for today.
judges: Wardlaw, Callahan, Murguia